## Bull *against* Towson.[*]

4 WS 557|
27 SC 5478|

On the trial of an issue directed by the Orphans' Court, where a witness testifies differently from what he had done before, the opposite party should be permitted to contradict him, by reading his deposition in the same case, filed in the court which directed the issue.

It is always competent for a party to show that the witness has related the facts trying, in a different manner, whether under oath or not.

The application of the rule in Starkie as to cross-examining upon collateral matters, explained.

After the marriage of a female ward, any money received, if any such could be received by the guardian for her, would be received, not as guardian, but to be paid over to her husband; could be sued for in a court of law, and is barred in six years.

After a ward comes of age, the fiduciary relation of guardian ceases; they stand as debtor and creditor; and the claim of the ward is clearly within the Statute of Limitations.

Where twenty-two years had elapsed since a ward came of age and her marriage, the Orphans' Court would have done right to have refused a citation to the administrators of her deceased guardian to settle an account.

A man who had ceased to be guardian could not be made answerable for the neglect of an administrator, on whom he had no right to call, and whom he could not sue.

In equity courts, twenty years is a positive bar to any claim.

Even a promise by guardian, after such lapse of time, without proof that he had funds, would seem to be void.

In such a case, where the testimony of the only witness is contradictory, after this lapse of time, every paper, statement, account, receipt, anything in the handwriting of the administrator or guardian relative to the matter in issue, if proved to have been made in the course of settling the estate by those whose duty it was to watch and check each other as administrator and guardian, is evidence.

It seems that the Orphans' Court has the power to direct as to future proceedings, after the reversal of a judgment on a feigned issue sent by that court to the Common Pleas.

ERROR to the Common Pleas of *Chester* county.

This was a feigned issue, directed by the Orphans' Court, in which Sarah Towson was plaintiff, and Levi Bull and Samuel Shafer, executors of the last will and testament of Thomas Bull, deceased, defendants.

Thomas Bull and another, guardians of the minor children of John Root, (of whom the plaintiff was one), in 1813 settled an account in the Orphans' Court, showing a balance in their favour against the estate of John Root, which was duly confirmed. The administrators of Root, in 1815, settled a re-re-re-supplementary account, showing a balance due the estate, being proceeds of sales

---

[*] We are indebted for the report of this case to W. H. Dillingham Esq.— REPORTERS.

[Bull v. Towson.]

of real estate, by order of the Orphans' Court. This issue was directed to determine whether Thomas Bull, as guardian, &c., had received any part of said balance from the administrator beyond the amount due on his guardianship account, and if so, how much.

The plaintiff, after giving in evidence the four administration accounts, settled respectively in 1803, 1807, 1809, and 1815, and showing the disposition of former real estate (called the Howell place), sold also by order of the Orphans' Court, called William Root, her brother, as a witness, for whom Thomas Bull had also been guardian. He testified, among other things, that in 1835, at the request of his sister, he had called on Col. Bull for a settlement, and that at this interview he admitted that $40 was all he had ever paid her—that this sum had been paid on her order, to her brother-in-law, Jehu Corwine; "that there was something there for them (alluding to the two younger sisters) yet, and wishing them to come on and have a settlement; that he was getting old; was 101 or 102 years old," &c. On his cross-examination, he testified: "He told me Mr Towson had called on him for a settlement. I asked him why he did not settle with Mr Towson. He did not assign any reason for not settling, and I did not ask him. He said he went off in a pet and a pout. I gave my deposition before in 1833. No!—in 1836 or 1837—two years after I had been up at Col. Bull's. My deposition was taken here. I am sure it was in 1836 or 1837. I am sure, because it was a short time after I settled for my mother's dower. I have confidence in my memory. I had not a settlement with Col. Bull. I had a settlement with Col. Bull directly after I arrived at the age of 21 years. I never had any other settlement. He paid me at that time about $100, and gave me his note for the balance. I can't give any idea of the balance. I was of age in 1811. Col. Bull never paid me any money since 1811. The last settlement that was made was for one of the places. I never had but one settlement. I had no settlement in 1826. He paid me no money in 1826. I don't recollect that he said he paid me money in 1826. If I did, it was a mistake. It was Ephraim Allen paid me in 1818. I believe I did say this week, that Col. Bull paid me in 1826, but I made a mistake; it was Ephraim Allen. I think I told Mr Culbertson. I told Mr Culbertson that Col. Bull paid me $100 and some odd, and gave me his note for the balance. I told him that. I don't recollect that I testified to the fact that Col. Bull paid me, in 1826, $284. Allen paid me the last money I got. I expect that is it, and it is a mistake. Mr Allen paid me and I took my brother's note for it. He got one of the places. I told Esquire Culbertson that I did not know whether it was Col. Bull or Allen paid me in 1826. I did not tell Mr Culbertson that Col. Bull had paid me $200 and gave me a note on Ephraim Allen for $100, I did not tell him that I took the note to Ephraim Allen,

[Bull v. Towson.]

and he paid it.   Mr Culbertson told me that it could not be, for Ephraim Allen died in 1820 or 1821.   I told him when we had a settlement Col. Bull paid me in part, and gave me his note for the balance.   I asked Culbertson what he had come here for.   He told me it was something about an arbitration he had been on.   I asked him who it was for.   He said he did not know whether for John or me.   I told him I had an arbitration when I settled with Col. Bull.   I did not know who the arbitrators were, only Esquire Mendenhall I knew, for he was the one I chose.   He said he did not think Esquire Mendenhall was on the arbitration he was on.   Then I said it could not be mine.   I asked him who the arbitrators were who had been with him.   He said David Potts and John Jones.   He said Samuel Packingham was one who had been chosen, but he could not attend, because he had gone with the Pennsylvania Militia to Baltimore.   I told him I had a settlement with Thomas Bull — the arbitration settled it — it was at Mr Lewis's tavern—they allowed me $50—that was all I received of the first place—it was upwards of $100 I received, and his note. Col. Bull never received any of the proceeds of the second place. I went to Col. Bull, and he told me he had never received any of the last place that John Root had bought, and told me to go to Allen, and he paid me.  This I think was in 1818.   My claim has been finally settled.   I think Mr Allen took a refunding bond from me.   I can't tell how much Col. Bull allowed the men should pay me.   This was before 1818.   Col. Bull paid me in 1811.   I have said I never gave Col. Bull a receipt.   I might have done it, and if I did, do not recollect it.   The amount paid me in cash and the amount of the note was the amount the men awarded.   I was present at the arbitration.   I do not recollect how the arbitrators were agreed.   I believe we entered into an arbitration bond with Col. Bull.   I authorized my brother John to receive the note that I left.   I can't tell whether he ever received it, but I expect he did.   I gave him as full authority as I could to receive it."

The plaintiff also called Elizabeth Furman, who testified— " Sarah Towson was my mother's sister.   My mother the eldest sister.   Sarah came to live in Philadelphia about the age of 12 or 13—lived there until she came to Baltimore in 1812 or 1813—has resided there ever since.   She was married in the year 1816, sometime in the fall of the year.   I am 46 years old this last spring.   Mrs Towson was 45 in February last.   I am perfectly satisfied of this."   On her cross-examination she stated, " I did say, when I gave my testimony before the auditors, that Sarah Towson was married in her 22d year.   I made a mistake—made myself older than that when last sworn, a year.   I intended in June 1840 to testify that Sarah Towson was 45 years old last February. I discovered this mistake since I came to West Chester this time :" and on her re-examination, she stated that she discovered her mistake when Mr Lewis mentioned it to her.

[Bull v. Towson.]

The defendants, among other things, offered to read in evidence the deposition of William Root, taken in this case when before the Orphans' Court: upon which occasion, after having been examined by the same party who adduced him now as a witness, and cross-examined by the opposite party, upon being re-examined in chief, he testified as follows: "The balance which Col. Bull paid me as my guardian was $284—that was in 1826. He did not pay me a cent of interest: he settled with me pretty much as he pleased, only I would not pay the whole charge of my keeping." This part of his deposition was rejected by the court, and exception taken.

The defendants then offered in evidence the following documents, which were first offered in connection, rejected by the court, and exception taken; and then offered separately; when some were admitted and others rejected, as follows:

1. The following papers were rejected:

An arbitration bond, John Root and William Root to Thomas Bull and Richard Templin, dated August 29th 1814, in the penalty of $4000—conditioned that John Root and William Root should abide by the award "of John Jones, James Culbertson, William Mendenhall, David Potts and Samuel Packingham, or any three of them, arbitrators indifferently chosen" by the parties "to arbitrate, &c., of and concerning all legacies held or paid by the above-mentioned Thomas Bull and Richard Templin, as guardians," &c., and all other actions whatsoever; the award to be made before the 1st day of October, then next.

2. Also, a refunding bond, William Root and John Root, Jr. to Ephraim Allen, administrator, &c. of John Root, deceased, dated June 23d 1817, in the penalty of $4010.32, reciting, "Whereas the said Ephraim Allen, administrator as aforesaid, has exhibited to me an account of his administration of the aforesaid deceased's estate, sold to John Root, Jr., of Chester county, and state above written, whereby it appears that the sum of $173.87, together with $31.29 interest, is due to me, William Root, one of the heirs of said deceased, as my full share of said estate, which sum I do hereby acknowledge that I have received from the above-named Ephraim Allen," with the ordinary condition to refund in case of deficiency of other assets, &c.

3. Also, the following paper:

"*Baltimore, May* 17*th* 1815.

Mr Thomas Bull and Richard Templin, our guardians,

Sirs:—Please to pay Jehu Corwine my legacy, and in so doing you will oblige your obedient servant,

her<br>
Sarah &times; Root.<br>
mark.

Witness, William Root."

[Bull v. Towson.]

This was endorsed, "Received, May 29th 1815, of Thomas Bull and Richard Templin, guardians for Sarah Root, child of John Root, the sum of $46.50, in full of my legacy or share out of Howell place, and the personal property of old place.

JEHU CORWINE."

4. Also, an award between William Root and Thomas Bull and Richard Templin, his guardians, made in pursuance of the above arbitration bond, September 10th, 1814, by David Potts, James Culbertson and John Jones, three of the arbitrators named in the bond, finding for William Root, £15.16.4½. This was endorsed with the receipt of *John Root, for William Root,* dated December 22d, 1814, of Thomas Bull and Richard Templin, guardians, for £15.3.4, in full of the within award.

5. The court admitted in evidence, the bond of John Root to Ephraim Allen, administrator of John Root, deceased, dated May 13th 1813, conditioned for the payment of $798.20, on or before the 1st day for March then next, without interest. This bond was endorsed with the receipt of Ephraim Allen, dated May 9th 1815, for $187.16½ " of the within bond."

6. The court rejected a paper which was endorsed " Last Statement of John Root's Estate." The inside heading was " The Re-Re-Re-Re-Re-Supplementary Account of the administration of Ephraim Allen, administrator of the estate of John Root, late of the township of East Nantmeal, in the county of Chester, deceased :" but was never filed in the Register's office. In it the accountant charged himself with $2079.81, the balance of his administration account confirmed August 3d 1815, and credited himself with the sums of $104.50, " paid Thomas Bull, expended by him on account of the estate :" and $114.57 " paid Thomas Bull, being the residue of a balance due him on settlement of his guardianship account," together with a few other items, and showed a balance of $1825.63 due the estate. There was also endorsed, a calculation, showing the widow's share of the balance to be $608.54, and that of each of 7 heirs to be $173.87 ; and the following : " I believe the within foregoing statement to be correct. C. KENNY." This was in the handwriting of Charles Kenny, who was Register of Wills during nine years prior to 1817. All the other parts of this paper were in the writing of Robert Sproul, Mr Kenny's deputy.

7. The court admitted the following paper :

" The estate of John Root, Dr. to Thomas Bull, for $104.50." This was endorsed, " Received, April 19th 1816, of Ephraim Allen, administrator of John Root, deceased, the sum of $104.50, in full of the within account.

THOMAS BULL."

" Received, April 19th 1816, of Ephraim Allen, administrator of John Root, deceased, the sum of $114, in full on settlement.
For Richard Templin, by Thomas Bull.

THOMAS BULL,    } Guardians."
RICHARD TEMPLIN, }

8. The court rejected the following receipts:

" Received, May 4th 1813, of Ephraim Allen, administrator of John Root, deceased, $34.98, being my dividend as one-seventh of the first instalment of the plantation sold to John Root.

THOMAS BULL."

" Received, May 4th 1813, of Ephraim Allen, administrator of the estate of John Root, deceased, the sum of $200, in part of balance due the guardians on settlement.

THOMAS BULL, Guardian."

9. The court rejected a paper containing two instruments not under seal, each dated May 29th 1815, and signed " Jehu Corn-wine." In one " Jehu Corwine intermarried to Margaret Root, orphan child of John Root, deceased, being of the age of 21 years," acknowledges to have received of Thomas Bull and Richard Templin, his guardians, $45.68, " in full of share of Howell's place," and releases the guardians. In the other, " Jehu Cor-wine, having an order from Sarah Root, orphan child of John Root, deceased, being of 20 years and upwards," acknowledges to have received of the same, guardians of Sarah Root, $46.50, " in full of my share of Howell place," and releases the guardians.

10. The court also rejected an account current between William Root and Thomas Bull, in the handwriting of John Jones, one of the arbitrators, showing a balance of £15.10.4½ due William Root: at the bottom is as follows: September 10th 1814. We have signed an award for the above balance.

DAVID POTTS,
JAMES CULBERTSON,
JOHN JONES."

Nos. 2, 5, 6, 7 and 8 of the above papers offered in evidence, were found by William Allen, among the papers of his father, Ephraim.

The errors assigned, which were urged on the argument, are embraced in the bills of exceptions to the rejection of testimony.

*P. Frazer Smith*, for plaintiff in error. 1. It was necessary to show the situation of John Root's estate with reference to the heirs generally: therefore any statement of William Root as to his share was relevant. The testimony in his deposition going to contradict his testimony on the feigned issue, ought to have been admitted for this reason: Also, to show that his recollection gene-rally was confused and indistinct: and this particularly as the

[Bull v. Towson.]

plaintiff's whole case rested on him, and could not have stood a moment without him.

Papers Nos. 2 and 6 ought also to have been admitted on the same ground. They went to contradict William Root, both as to the person with whom he settled for his share, the time when he settled, and the amount he received: and to show that his recollection was inaccurate. Also, to show the amount coming from the administrator to each of the heirs. The same amount must have been due from the administrator to each, whatever might have been due from the guardian. Also, to show at how late a time the estate was still in the hands of the administrator. In connection with other evidence, it was for the consideration of the jury, in ascertaining whether the plaintiff was not of age or married at that time, and that the guardian had no right to receive it. They were admissible as part of the *res gestæ*, being papers connected with the settlement of the estate, out of which the claim of the plaintiff arose. 2 *Whart.* 410.

Paper No. 6 was admissible of itself as the declaration of Ephraim Allen, the administrator, he being dead, against his interest, or without his having any motive to falsify, and at the same time being from his situation peculiarly if not exclusively cognizant of the transactions relating to this estate: and of a matter which he would have been permitted to testify to if living. 1 *Starkie's Ev.* 308, 309 ; *Gressley's Eq. Ev.* 221 ; 3 *Watts & Serg.* 373. And although the paper was not in his handwriting, it became his declaration, being kept by him as one of the memoranda relating to this estate. 7 *East* 279.

Papers No. 3 and 9, were admissible upon the same general principles, to contradict William Root, as to the amount received by the plaintiff through Jehu Corwine: to show that whatever was thus received was not part of the money out of which the plaintiff claimed, as both papers state that it was from another source, and are dated before the administration account of 1815 was confirmed.

Paper No. 9, was evidence of the age of Sarah Towson, being the declaration of her agent acting as such and within the scope of his authority. 7 *Watts* 39. Also, upon the principle above stated, as the declaration of Jehu Corwine, he being dead, of facts—the receipt of the money which was a declaration *against* his interest, and the age of Sarah Root, in stating which he had at least no interest to falsify.

Papers No. 1 and 4, were admissible to contradict William Root as to his own settlement with his guardian, both as to time and amount. And these, together with all the papers rejected in the court below, should have been admitted, after so long a time had elapsed, as explaining the situation of the estate of John Root, independently of any effect they might have in contradicting John Root. Courts will, in cases like this, do all in their power to assist

[Bull v. Towson.]

representatives of a deceased trustee to throw light upon ancient and now obscure transactions connected with his trust, and will not be disposed to apply the rules of evidence with the same strictness as where the transactions could be elucidated by living witnesses.

*Lewis,* for defendant in error. The fact offered to be contradicted by the passage in the deposition rejected below, was irrelevant; it was a part of the defendant's own case; she had first inquired as to the *settlement,* and therefore should not be permitted to contradict the witness in this particular; and the question propounded to the witness was not sufficiently *specific.* 1 *Stark. Ev.* 134, 135; 2 *Camp.* 638; 4 *Watts* 51; 11 *Serg. & Rawle* 139; 5 *Whart.* 288. There was no presumption of payment in this case, because, as we allege, the plaintiff came of age after marriage. 2 *Watts* 209.

As to the papers rejected, they were *res inter alios acta,* and not a part of the *res gestæ.* A mere recital as to age should not be permitted to affect us. The paper endorsed "last settlement," of Ephraim Allen, never having passed the register's office, and being in discharge of his own liability, was properly rejected. That it was in discharge of his liability appears from the diminished balance compared with that of the last account settled and confirmed.

*Dillingham, in reply.* The passage of the deposition ruled out was testimony introduced by the plaintiff upon the re-examination of her own witness after our cross-examination, and had been mainly relied upon by the President Judge in the Orphans' Court when he sent this case to an auditor. It is not for the plaintiff now to say it was irrelevant, and therefore not the subject of contradiction, after having herself introduced it. But it was not irrelevant. If true, it would have laid the ground for a strong inference against us. It should have been admitted upon the same principle upon which we were permitted to contradict the witness on the same point, from a conversation the day before the trial, as shown by the record.

The papers rejected were a part of the *res gestæ* about which the witness has given testimony. They were either papers to which he was a party or of which he had spoken; they show that he did not tell the whole truth, and that what little he did tell was inaccurate. The only bearing his evidence could have upon the issue was by making the alleged conversation with Col. Bull relate to the proceeds of sale of the last property. From his slight proofs large presumptions were to be drawn in favour of the plaintiff. These papers demonstrate that such presumptions would not be legitimate, thus going to explain and correct his testimony. But independent of the principle that we had a right to contradict

[Bull v. Towson.]

the words of the witness by his acts, and by the papers of which he had spoken, they were evidence in and of themselves to explain this issue, from their age, their authenticity and the manner in which they had been preserved among the vouchers of Ephraim Allen's estate. They were memoranda and documents in the regular course of business properly authenticated, bearing upon the point in issue, pertaining to matters to which E. Allen could have testified had he been alive. Upon the authorities cited, we contend that they are evidence *per se.*

The recital as to the plaintiff's age in an instrument executed by her brother-in-law and agent while transacting her business, ratified by her after coming of age, was adequate proof of this fact.

This case is anomalous in all its features; that it should have been sent to an auditor after more than 20 years had elasped from the time the guardianship ceased, when not only the presumption from lapse of time, but even the Statute of Limitations should have barred the claim—that an issue should have been directed upon so plain a state of facts as that reported by the auditor; that such evidence should have been rejected as that contained in both bills of exceptions; that such a verdict should have been rendered upon the evidence actually given; that a new trial should have been refused; and that this verdict should have been modified by the court below in the judgment finally rendered, when the sole object of the issue was to ascertain the facts of the case by the finding of a jury.

The opinion of the Court was delivered by

HUSTON, J.—This case presented the following facts. John Root died in Chester county about the year 1800, leaving issue Margaret, Samuel, John, William, Sarah and Elizabeth. Ephraim Allen and William Ross administered on his estate, and on the 17th of March 1801, Thomas Bull and Richard Templin were appointed guardians of his children, six in number. Sarah's age was stated to be four years. The administrators settled several accounts at different times, from 1803 up to 1815. Previous to the second settlement Allen had sold a tract of land to pay debts, and had been at prior settlements in advance to the estate. After the sale of the land, some of the heirs, who were of age, settled with the administrators and guardians. This was about 1811. An application was made to the Orphans' Court to divide or appraise the remaining land. The inquest found it could not be divided, and appraised it. The heirs all refused to take it at the value put on it by the inquest, and it was in due form sold by the administrator and purchased by John Root, one of the heirs. He had made a contract with a Mr Galt to be partner in the purchase, and he and Galt paid part of the first instalment. The deed, however, was made to John Root alone. This was about

[Bull v. Towson.]

1813. Galt was dissatisfied; and in 1814 agreed to give up his interest, and John Root sold a part of the land and repaid to Galt what he had paid. We know no more about this, except that a few years after the land was sold from John Root by the sheriff, but whether for the remaining instalments or not does not appear on our paper-book. The widow was alive, and one-third of the purchase money was left in the land to pay the interest to her during her life. She died about 1834 or 1835, and then this third became due and payable to the several heirs.

In the mean time Thomas Bull and Richard Templin settled their account as guardians, on the 3d of May 1813. No exceptions were filed, and at August term 1813 it was confirmed. By this account a balance was found due the guardians of £117 19s. 1d. This was the balance on their whole account. They seem to have made a separate settlement with each as they came of age; for William Root swears they made a final settlement with him in 1811. Col. Bull, the surviving guardian, however, paid about $46 to each of the two youngest children in the spring of 1815, as was admitted and will appear. Sarah Towson was the youngest, and then single.

When land is appraised and sold on petition of the heirs, the sale is made by the administrator; and when the price comes into his hands, if any debt remains due by the estate, he pays it and divides the surplus among those entitled by law. The administrator paid the guardians the sum due them, and some other small debts. It seems to be proved and conceded that the administrator paid the elder children, they being all of age, but Sarah and Elizabeth. Col. Bull had no right to interfere between them and the administrator; and as there is no proof that Allen received any more than the first instalment until after Sarah was of age and married, he had no right to receive any for her after she was of age or married, for her husband had then the right to demand and receive it from the administrator. She was probably of age in 1816, and certainly married in September of that year. Her husband lived until about 1832. Col. Bull, the surviving guardian, lived until 1838. And after his death his administrators were cited in the Orphans' Court to settle an account by Sarah Towson, then a widow. As 22 years had elapsed since her coming of age and marriage, the Orphans' Court, it would seem, hesitated to grant a citation against the representatives of a guardian who had not been called to account for 22 years. That court would have done right in refusing the application, and probably would have refused it, but an affidavit of William Root, her brother, was made, stating that Col. Bull, as his guardian, had paid him $284 in 1826, and in 1835 had admitted there was money due to Sarah. After some discussion the court directed an issue " to try the question whether Thomas Bull, as guardian of Sarah Towson, received any part of the balance appearing to be due on the administration

[Bull v. Towson.]

account settled by E. Allen, administrator of the estate of John Root, deceased, on the 9th of May 1815, and confirmed by the Orphans' Court of said county on the 3d of August in the same year, and if so, how much of the said balance beyond the sum appearing to be due by the guardians on the guardianship account settled by the said Orphans' Court in 1813?" This cause was the trial of that issue.

By the direction of the court the plaintiff declared for money had and received, and the defendants pleaded the general issue. The plaintiff showed the four administration accounts of E. Allen, the last of which, confirmed 3d of August 1815, showed a balance to be accounted for of $2079.81. In this account the price of the land sold on the petition for appraisement, valuation and sale, was included. The plaintiff also showed the account of T. Bull and R. Templin, the guardians, filed in May and passed and confirmed 2d of August 1813, by which it appeared they were in advance for the estate £117 19s. 1d. (Here his Honour recapitulated the evidence already stated.)

All these papers were offered together and rejected. I do not say this was wrong. It is embarrassing to a court to offer a dozen or more papers having no immediate connection with each other. In this case they were all offered either to show that Col. Bull had settled many years ago for all he received, or to show that William Root's memory was not to be relied on; and these papers were all testimony in this cause for one or the other purpose. They were afterwards offered singly, and some received and some rejected, and bills of exception sealed. I go back to the first bill of exception. The refusal to permit the defendants to read that part of William Root's deposition given in the Orphans' Court in which he had stated that Col. Bull settled his account and paid him $284 in 1826. There is reason to believe that in the hurry of a trial this was stated and understood by the court to have come out on cross-examination. It was so stated here, and authorities were cited applying to it in that point of view. In fact, after defendants had cross-examined him, the plaintiff again re-examined him, and he stated as above. Besides, the doctrine in 1 *Stark.* 134, 135, *sect.* 22, if correct, is not applicable to the case before us, which, after a witness had been sworn in court, was simply to show that by his own deposition filed in the Court by which this issue had been directed, he had given a statement of the facts inconsistent with and directly contrary to what he had just stated to the jury. The doctrine in *Starkie* speaks of cross-examining as to other and similar transactions with other persons, and if such examination is permitted, says you shall not disprove the truth of witness's statement, for it would make trials interminable; but neither Starkie nor any other author or court of which I have read or heard, has ever said you may not prove that the witness,

[Bull v. Towson.]

either under oath or not, has related the facts trying in a different manner. Among many other cases, see 8 *Serg. & Rawle* 325 expressly in point, and 12 *Serg. & Rawle* 325. There was error in this.

In order to judge of the other bills of exceptions, we must see what was in issue and what plaintiff had proved. The issue was to try whether Col. Bull *had received* (not whether he could and ought to have received) any part of the balance appearing on the account of E. Allen, administrator, filed and confirmed in 1815. Col. Bull had been appointed guardian of these children in 1801. In this petition, Sarah, the plaintiff, is called four years old. The age there stated will go for little when we see the age of William there stated at six years; and yet he swears he was 21 in 1811. After a ward came of age the guardian could not rightfully receive, nor the administrator rightfully pay him any money for such ward. William had sworn in the Orphans' Court, to obtain this issue, that Col. Bull had got and retained $284 of his money until 1826. He had asserted the same thing during the week of this trial, and though contradicted as to the time, he still stuck to the sum. It was competent, and strange it would be if it were not, to show, that instead of Col. Bull settling with him alone and paying or sending him to Allen for above $200, the settlement was made by arbitrators, and the sum due, £15 3s. 4d., and paid to him by Col. Bull, and his receipt given in 1814, three years after he was of age; and to prove that Allen paid to himself in 1817 the whole of what was due to him until the death of his mother, and that this sum was $173.87; and it was competent to show the calculation made for E. Allen by the deputy register, overlooked by the register and endorsed by Allen as the last statement of the moneys of J. Root's estate. Even a calculation from documents in court, made at the bar, showing that the sum paid and for which he gave a refunding receipt, was the correct one, might have been shown. It was not conclusive, but it could be shown in such a case as this. It went directly to show that Col. Bull never received nor paid any money for this witness after the last sale; and it went directly to show that this main and only witness for the plaintiff swore directly contrary to the truth—either that he was determined to gain the cause for his sister, or that he had no sense of the obligation of an oath, or that he was literally of nonsane memory, and swore as prompted by a deranged imagination.

Sarah was of age or at all events married in 1816, and her husband had a right to this money. Any money received, if any such could be received after this, was received not as guardian, but to be paid over: he could have been sued for it in a court of law and was barred in six years. But there was evidence to prove that he never received a cent for her after 1815, when he paid on her order all he had. Nay, the proof was that Allen, the

[Bull v. Towson.]

administrator of her father, never got any, except a small part of the last bond, and it must have been by some curious system of casuistry that a man who had ceased to be guardian could be made answerable for the neglect of an administrator on whom he had no right to call and could not sue; to say nothing of the limitation of six years, within which this claim clearly was, and by which it was barred; for after a ward comes of age the fiduciary relation of a guardian ceases, and they stand as debtor and creditor. Even in Equity Courts, 20 years is a positive bar by repeated decisions, founded on sound principles. See *Foulk* v. *Brown*, (2 *Watts* 209). If this can be altered by an admission of the trustee or a promise, and I do not say it can, after the lapse of time has run, yet if this promise is disproved, or if the witness makes it one thing at one time, and a little stronger the next, and if every sentence in the testimony of the only witness is positively disproved by documents, by the oaths of others, or by his own oaths at different times, the admission or promise cannot be believed, and length of time bars the claim. In *such a case, after such lapse of time,* every paper, statement, account, receipt or anything in the handwriting of the administrator or guardian relative to the matter in issue, if proved to have been made in the course of settling the estate by those whose duty it was to watch and check each other, as administrator and guardian, is evidence to be received in judging of the case. The issue is correctly ordered; for if Col. Bull never received the money sued for, his promise, if he ever made one, would be void. It could only be binding on proof that he had funds; and how it can be believed that he received money from Allen, who never collected it, but left the bond of John Root the younger, with only a receipt on it for one-fourth of the amount paid, is not easy to see. When a feigned issue is directed by a Court of Equity, that court may grant a new trial or not. It would seem the Orphans' Court have the power to direct as to future proceedings.

Judgment reversed, and a *venire de novo* awarded.